UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

KEITH ARTHUR THIBEAULT,

                        Petitioner,

                                 Case No. 1:17-cv-70

v.

                                 Honorable Janet T. Neff

BONITA HOFFNER,

                        Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Keith Arthur Thibeault is incarcerated with the Michigan Department of Corrections at Lakeland Correctional Facility (LCF) in Coldwater, Michigan.  On June 4, 2013, an Ionia County Circuit Court jury, found Petitioner guilty of first-degree child abuse, MICH. COMP. LAWS § 750.136b(2), and felony murder, MICH. COMP. LAWS § 750.316(b).  On August 13, 2013, the court imposed concurrent sentences of 7 years, 11 months to 15 years for first-degree child abuse and life without parole for felony murder.

        On January 20, 2017, Petitioner filed his habeas corpus petition raising three grounds for relief, as follows:

        I.      THE TRIAL COURT VIOLATED THE PETITIONER'S DUE PROCESS RIGHT TO A FAIR TRIAL BY PERMITTING THE PROSECUTOR TO INTRODUCE EVIDENCE OF THE PETITIONER'S ALLEGED PRIOR BAD ACTS UNDER THE GUISE OF MRE 702, 703 AND 704, WHERE THE DANGER OF UNFAIR PREJUDICE SUBSTANTIALLY OUTWEIGHED ANY PROBATIVE VALUE PURSUANT TO US CONST, AM XIV; CONST 1963, ART 1, § 17.

        II.     THE PROSECUTOR'S REPEATED MISCONDUCT DEPRIVED THE PETITIONER OF A FAIR TRIAL AND DUE PROCESS OF LAW, THE

ERROR WAS PLAIN, OR IN THE ALTERNATIVE TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING PURSUANT TO US CONST, AMEND V, VI, XIV; CONST 1963, ART 1, §§ 17, 20.

III.    THE PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED WHEN HE WAS CONVICTED OF FIRST DEGREE CHILD ABUSE AND FELONY MURDER PREDICATED ON FIRST DEGREE CHILD ABUSE WITHOUT SUFFICIENT EVIDENCE TO PROVE THOSE OFFENSES BEYOND A REASONABLE DOUBT PURSUANT TO US CONST, AMS V, VI, XIV; CONST 1963, ART 1, SEC. 17, 20.

(Pet., ECF No. 1, PageID.3-4.)  Respondent has filed an answer to the petition (ECF No. 6) stating that the grounds should be denied because they are noncognizable, meritless, or procedurally defaulted.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition be denied.

## Discussion

### I.    Factual allegations

Petitioner and his wife Nicole had twin baby boys, Keegan and Everette, on December 30, 2011.  (Trial Tr. II, ECF No. 7-7, PageID.446-447.)  Keegan was a healthy baby, but Everette struggled with reflux.  (Trial Tr. VI, ECF No. 7-11, PageID.1303.)  Both boys were doing well when Petitioner picked them up from the babysitter's home on Friday, March 23, 2012.  (*Id*., 1306; Trial Tr. II, ECF No. 7-7, PageID.506-507.)

As Petitioner fed the two boys a few hours later, Everette fell from the couch to the carpeted floor.  (Trial Tr. VI, ECF No. 7-11, PageID.1309-1311.)  Everette seemed bothered by the fall, but he recovered quickly and took about one-half ounce of formula after the fall.  (*Id*., 1311.)  Both boys dozed off, so Petitioner brought them upstairs to bed.  (*Id*., PageID.1311-1312.)  In the bedroom, Everette was crying.  (*Id*., PageID.1312.)  Petitioner attempted to soothe Everette by "bicycling" his legs.  (*Id*., PageID.1312-1313.)  Everette passed out.  (*Id*., PageID.1313.)

2

Petitioner noticed that Everette was not breathing properly.  (*Id*.)  Everette threw up and there was blood in his vomit. (*Id*.)  Then Everette stopped breathing.  (*Id*., PageID.1314.)  Petitioner called 911.  (*Id*.)

The 911 operator directed Petitioner to perform CPR on Everette as they waited for the ambulance to arrive.  (*Id*., PageID.1315.)  The ambulance took Everette and Petitioner to Sparrow Hospital in Lansing, Michigan, where Nicole was working as a medical secretary.  (Trial Tr. I, ECF No. 7-6, PageID.390, 394.)  Nicole met them at the emergency room when they arrived.  (*Id*., PageID.390.)  Although the doctors were able to restore a heartbeat and keep Everette breathing on a ventilator, the damage to Everette's brain was severe.  (Trial Tr. III, ECF No. 7-8, PageID.757-758, 766-767, 778-782.)  The following day, Petitioner and Nicole decided to remove the ventilator.  (Trial Tr. III, ECF No. 7-8, PageID.806-808, 818-819.)  Everette died shortly thereafter.

Petitioner was the only person with Everette from that Friday night until the Saturday morning trip to the hospital.  The doctors who treated Everette believed that the injuries were recent and the product of abuse.  The coroner did as well.

At Petitioner's trial, Dr. Guertin testified that the injuries that caused Everette's death were the product of abuse.  (Trial Tr. IV, ECF No. 7-9, PageID.995-997.)  Among the facts Dr. Guertin relied upon to support his opinion were: (1) the presence of an earlier rib injury to Everette that was revealed during the autopsy (*Id*., PageID.982-984); and (2) the presence of a leg injury to Keegan that was discovered upon closer examination after Dr. Guertin assessed Everette's injuries (*Id*., PageID.994-995).  Petitioner sought to keep those facts out at trial, claiming that they were, for all intents and purposes, propensity evidence under Michigan Rule of

Evidence 404(b) and that the prosecutor had failed to comply with the procedural prerequisites for introducing such evidence.  (Trial Tr. I, ECF No. 7-6, PageID.312.)

The prosecutor countered that he could not show that the injuries were caused by Petitioner and that, therefore, he was not offering them as propensity evidence.  (*Id*., PageID.312-313.)  The prosecutor contended, instead, that the evidence was admissible under Michigan Rule of Evidence 703 as part of the foundation for the opinion of the prosecutor's expert.  (*Id*., PageID.314-315.)  The trial court acknowledged that it was a close call, but admitted the evidence under Rule 703 and gave a limiting instruction to the jury with regard to its use of that evidence.  (Trial Tr. I, ECF No. 7-6, PageID.380-387; Trial Tr. II, ECF No. 7-7, PageID.438-443; Trial Tr. IV, ECF No. 7-9, PageID.934-935.)

The trial became a battle of experts.  The first expert to testify on behalf of the prosecution was ophthalmologist Giora Adam.  (Trial Tr. III, ECF No. 7-8, PageID.828-861.)  Based on his examination of Everette's eyes, and the presence of extensive retinal hemorrhages, subdural hematoma, and no external impact sign, Dr. Adam concluded that Everette had suffered an inflicted head injury.  (*Id*., PageID.841-845.)  He further testified that the type of retinal hemorrhages suffered by Everette were almost always associated with abuse.  (*Id*.)

Dr. Adam was followed by Dr. John Bechinski, a forensic pathologist at Sparrow Hospital.  (*Id*., PageID.870-925.)  Dr. Bechinski performed an autopsy on Everette on March 26, 2012.  (*Id*., PageID.873.)  Based on the severity of the bleeding in the brain, Dr. Bechinski also concluded the head injury caused Everette's death and it was "inflicted."  (*Id*., PageID.883.)  Accordingly, Dr. Bechinski found that the manner of death was homicide.  (*Id*., PageID.885-888.)  He also concluded the injuries that Everette sustained could not have been caused by the fall from the couch.  (*Id*., PageID.888-889.)

4

After Dr. Bechinski, the jury heard from Dr. Rudolph Castellani, a neuropathologist and professor at the University of Maryland.  (Trial Tr. IV, ECF No. 7-9, PageID.935-973.)  Dr. Castellani reported on his examination of Everette's brain and eyes.  Dr. Castellani noted that the injuries he found were most commonly encountered in inflicted or abusive injuries.  (*Id*., PageID.947.)  Dr. Castellani further reported that Everette's death was the result of recent trauma. (*Id*., PageID.951.)  Dr. Castellani also testified that it would be almost impossible for the fall from the couch on to a carpeted surface to cause the injuries Everette suffered.  (*Id*., PageID.965.)

Finally, the prosecutor called Dr. Stephen Guertin, director of the pediatric intensive care unit (PICU) at Sparrow Hospital.  (*Id*., PageID.975-1032.)  Dr. Guertin was qualified as an expert in general pediatrics, pediatric critical care, and child abuse.  (*Id*., PageID.977.)  Dr. Guertin was Everette's treating physician once Everette was transferred to the PICU from the ER. (*Id*., PageID.979.)  Dr. Guertin also reported that it would be virtually impossible for the fall from the couch to have caused the severe injuries Everette suffered.  (*Id*., PageID.987-994.)  Dr. Guertin echoed the testimony of the other experts that the injuries that killed Everette were recent.  (*Id*., PageID.996.)  Dr. Guertin opined that the injuries Everette suffered were caused by abuse.  (*Id*., PageID.997.)

Petitioner countered with the testimony of Dr. John Plunkett, a forensic pathologist. (Trial Tr. V, ECF No. 7-10, PageID.1039-1130.)  Dr. Plunkett was qualified as an expert in forensic pathology, anatomic pathology, and clinical pathology.  (*Id*., PageID.1053.)  Dr. Plunkett poked holes in Dr. Guertin's analysis.  He ultimately opined that falling from a couch on to a carpeted floor could have caused the injuries that killed Everette.  (*Id*., ECF No. 7-10, PageID.1085-1086.)

After Dr. Plunkett's testimony, the defense presented Dr. Steven Abern, a pediatric neurologist.  (Trial Tr. VI, ECF No. 7-11, PageID.1147-1222.)  Dr. Abern was qualified as an expert in pediatric neurology.  (*Id*., PageID.1149-1150.)  Dr. Abern opined that Petitioner's compromised health condition, perhaps caused by complications at birth, was aggravated by the fall from the couch creating a cascade of events that resulted in Everette's death.  (*Id*., PageID.1165.)

The defense also called Dr. Chris Van Ee, a biomechanical engineer.  Dr. Van Ee was qualified as an expert in biomechanics.  (*Id*., PageID.1245-1293.)  Dr. Van Ee testified regarding the nature of the change in head motion that occurs in falls of different distances onto different surfaces.  (*Id*.)  He also compared the change in head motion from such falls with that which occurs with shaking.  (*Id*., PageID.1259-1268.)  Dr. Van Ee represented that a fall from the couch onto a carpeted floor could have caused a subdural hematoma and that it could involve more damaging changes in head motion than shaking.  (*Id*.)

In rebuttal, the prosecution called Dr. Carl Schmidt, a forensic pathologist.  (Trial Tr. VII, ECF No. 7-12, PageID.1377-1399.)  Dr. Schmidt was qualified as an expert in anatomic, clinical and forensic pathology.  (*Id*., PageID.1380.)  Dr. Schmidt reviewed the records relating to Everette, as well as the reports of Dr. Plunkett and Dr. Abern.  (*Id*., PageID.1381.)  He concluded that Everette died of abusive head trauma and the manner of death was homicide.  (*Id*., PageID.1382.)

The prosecution recalled Dr. Guertin as its final witness.  Dr. Guertin reviewed and commented on the findings by Dr. Plunkett and Dr. Abern.

The jury deliberated for about four hours before returning its verdict of guilty on the charges of first-degree felony murder and first-degree child abuse.  (Trial Tr. VII, ECF No. 7-12, PageID.1515-1518.)

With the assistance of counsel, Petitioner directly appealed his convictions to the Michigan Court of Appeals raising four issues: the three habeas issues identified above plus an additional issue regarding the jury *voir dire*.  (Appellant's Br., ECF No. 7-14, PageID.1550.)  The Michigan Court of Appeals issued an unpublished opinion dated February 26, 2015, affirming the trial court.

Petitioner, again with the assistance of counsel, then sought leave to appeal in the Michigan Supreme Court raising the same issues he had raised in the Michigan Court of Appeals.  (Appellant's Appl. for Leave to Appeal, ECF No. 7-15, PageID.1679.)   That court denied leave by order entered November 4, 2015.  This petition followed.

## II.    AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. ___, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### III.    Prior bad acts or propensity evidence

Petitioner contends that the trial court's admission of evidence regarding Everette's broken rib and Keegan's broken leg violated his right to due process because it violated Michigan Rules of Evidence 404(b) and 403.  Michigan Rule of Evidence 404 provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MICH. R. EVID. 404(b)(1).  Rule 403, on the other hand, requires the exclusion of even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  MICH. R. EVID. 403.

The prosecutor argued, and the trial court concluded, that the prosecution was not introducing the evidence to show Petitioner's action in conformity therewith.  Indeed, the prosecutor freely acknowledged that he could not show who caused or was otherwise responsible for the broken rib or the broken leg.  Instead, the prosecutor sought to introduce the evidence under Michigan Rule of Evidence 703.  That rule provides: "The facts or data in the particular case upon

which an expert bases an opinion or inference shall be in evidence." MICH. R. EVID. 703.  The

prosecutor's experts relied on the presence of these other injuries to support their respective

conclusions that Everette had been the victim of child abuse.

The trial court admitted the evidence under Rule 703, but gave a limiting instruction

to the jury:

> Ordinarily when you hear evidence you can consider it for any reason you'd like in
> your deliberations.  However, occasionally evidence comes in for a limited purpose.
> In this matter you have heard evidence of prior injuries to the children Everette and
> Keegan and today you will hear evidence about those same injuries.  That evidence
> is being admitted and given to you only to help you understand the basis of the
> expert's opinions.  The defendant is not on trial for those other prior acts so you
> can consider this testimony only for the limited basis of the experts' opinions.

(Trial Tr. IV, ECF No. 7-9, PageID.934-935.)

The Michigan Court of Appeals agreed that evidence regarding Everette's broken

rib was admissible under Rule 703, was not excludible as violative of Rule 404(b), and was

admissible under Rule 403.[1]  (Mich. Ct. App. Op., ECF No. 7-14, PageID.1539-1540.)  The court

noted that such evidence was certainly relevant under Michigan law, because "'the signs of past

physical abuse of the child were relevant to prove that his subsequent fatal injuries were not

inflicted accidentally.'"  (*Id.*, PageID.1538) (quoting *People v. Knox*, 674 N.W.2d 366 (Mich.

2004)).  Indeed, the court determined the evidence was "highly relevant" and that its probative

value was not substantially outweighed by the danger of unfair prejudice.  (*Id.*, PageID.1539-

1540.)

The court of appeals, however, concluded that evidence of Keegan's broken leg

was not admissible under Rule 703 because such evidence did not "tend[ ] to establish grounds

upon which the experts based their opinions . . . ."  (*Id.*, PageID.1538.)    Nonetheless, the court

---

[1]The court explained that even if such evidence were allowed under Rule 703, it would still have to satisfy the
requirements of Rules 403 and 404.  (Mich. Ct. App. Op., ECF No. 7-14, PageID.1538.)

afforded Petitioner no relief, because it concluded that the evidence was not outcome-determinative and its prejudicial impact had been minimized by the trial court's limiting instruction.  (*Id*., PageID.1538-1539.)

Petitioner contends that the Michigan courts erred in two distinct respects.  First, he contends the evidence does not fall within the defined limits of permissible "propensity" evidence under Michigan Rule of Evidence 404(b).  Second, he contends that, whether or not Rule 404(b) would permit admission of the evidence, Rule 403 requires its exclusion because the risk of unfair prejudice substantially outweighs any probative value.

To the extent Petitioner's challenge is grounded in his claim that the state courts violated state evidentiary rules, he is not entitled to habeas relief.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.

To prevail, therefore, Petitioner must demonstrate something more than violation of a state rule of evidence.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This Court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently

11

than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  Put differently, the Sixth Circuit "has typically required a Supreme Court case establishing a due process right with regard to that specific kind of evidence." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) (citing *Collier v. Lafler*, 419 F. App'x 555, 558 (6th Cir. 2011)).  Petitioner attempts to make such a showing with respect to the category of "propensity" or "prior bad acts" evidence.

Petitioner claims that *Old Chief v. United States*, 519 U.S. 172, 181 (1997), is clearly established federal law regarding "prior bad acts" evidence with which the Michigan appellate court's decision is in conflict.  (Pet'r's Br., ECF No. 1, PageID.52.)  Petitioner's reliance on the *Old Chief* decision is misplaced.  There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.

In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75.[2] The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit

---

[2] The Court's statement of the evidentiary issue in *Estelle*, though based on California law, is particularly damning to Petitioner's position:

> We thus turn to the question whether the admission of the evidence violated McGuire's federal constitutional rights.  California law allows the prosecution to introduce expert testimony and evidence related to prior injuries in order to prove "battered child syndrome."  [citations omitted].  The demonstration of battered child syndrome "simply indicates that a child found with [serious, repeated injuries] has not suffered those injuries by accidental means." *Id*., at 507, 95 Cal. Rptr., at 921.  *Thus, evidence demonstrating battered child syndrome helps to prove that the child died at the hands of another and not by falling off a couch, for example; it also tends to establish that the "other," whoever it may be, inflicted the injuries intentionally.  When offered to show that certain injuries are a product of child abuse, rather than accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who might have inflicted those injuries.* [citations omitted].

*Estelle*, 502 U.S. at 68 (emphasis supplied).

a charged crime.  *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief*, 519 U.S. at 17; *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh*, 329 F.3d at 512.  Because the admission of "bad acts" evidence, standing alone, does not implicate constitutional protections under clearly established federal law, it cannot be said that the Michigan Court of Appeals' decision on that point is contrary to clearly established federal law.

Petitioner then turns to Rule 403.  Rule 403 does not address a "specific kind of evidence;" it addresses the potential effect of admitting evidence on the proceeding.  Rule 403 excludes evidence where its probative value is substantially outweighed by the risk of unfair prejudice, confusion, or deception.

The admission of evidence deemed unfairly prejudicial does not, in and of itself, violate due process.  The evidentiary ruling must be "so egregious that it results in a denial of fundamental fairness."  *Bugh*, 329 F.3d at 512.   "Whether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor."   *Ege v. Yukins*, 485 F. 3d 364, 375 (6th Cir. 2007); *see also Bojaj v. Berghuis*, __ F. App'x __, 2017 WL 3129119 (6th Cir. Jul. 24, 2017); *Burger v. Woods*, 515 F. App'x 507 (6th Cir. 2013); *Hudson v. Lafler*, 421 F. App'x 619 (6th Cir. 2011); *Collier*, 419 F. App'x at 559; *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000).[3]

---

[3] The Sixth Circuit has acknowledged that the "crucial, critical highly significant factor" test is not clearly established federal law:

With regard to evidence pertaining to Everette's broken rib, this Court need not consider the significance of the evidence because Petitioner has failed to demonstrate that the evidence was more prejudicial than probative.  The Michigan Court of Appeals determined that "the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice." (Mich. Ct. App. Op., ECF No. 7-14, PageID.1540.)  Petitioner has failed to show that the determination is unreasonable on this record or contrary to, or an unreasonable application of, clearly established federal law.  The determination is entirely consonant with the clearly established federal law of *Estelle*, see note 2, *supra*.  Accordingly, Petitioner is not entitled to habeas relief with regard to the admission of evidence of Everette's broken rib.

With regard to evidence about Keegan's broken leg, although the Michigan Court of Appeals did not expressly state that the evidence was more prejudicial than probative, that conclusion is implicit in its analysis of relevance:

> In this case, evidence of the prior injuries to the victim's brother were not admissible to prove that the victim's subsequent fatal injuries were deliberately inflicted by defendant.  Here, whether the brother suffered a prior injury had no bearing on the victim's injuries.  The source of the injury was unknown and there was no evidence that the injury was in any way related to the victim's fatal injuries.  Thus, evidence of that injury was not factual evidence that tended to establish grounds upon which the experts based their opinions and it should not have been admitted under MRE 703.

(Mich. Ct. App. Op., ECF No. 7-14, PageID.1538.)  The court went on to evaluate whether the admission was outcome determinative.  (*Id*., PageID.1538-1539.)  The court concluded that, in light of the limiting instruction by the trial court and "the significant amount of other circumstantial

---

as the Supreme Court recently emphasized, "circuit precedent"—even from our own circuit—"does not constitute clearly established federal law, as determined by the Supreme Court."    [citation omitted].  The "crucial, critical highly significant factor" standard derives from no Supreme Court case . . . .

*Olson v. Little*, 604 F. App'x 387, 406 (6th Cir. 2015).  Nonetheless, it provides a helpful analytical framework for assessing whether the admission of evidence has denied a petitioner a fundamentally fair trial.

evidence, including expert testimony concerning the extent of the victim's injuries and evidence that the victim suffered the injuries while in defendant's exclusive custody, evidence that [Keegan] had a prior abusive injury was not outcome determinative." (*Id.*, PageID.1539.)

The state appellate court's evaluation of whether the evidence was outcome determinative is comparable to the federal due process inquiry into whether the evidence was material. The court of appeals' factual determinations in support of its decision are well-supported in the record and Petitioner has failed to identify any clearly established federal law to which the state appellate court's decision is contrary. Evidence regarding the injury to Keegan's leg was peripheral to the heart of the prosecution's presentation. The jury was properly instructed with regard to its limited use of the evidence. Unless the evidence at issue is "devastating" or there is "an 'overwhelming probability that the jury will be unable to follow the court's instructions[,]'" juries are presumed to follow their instructions. *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000). Petitioner offers nothing to overcome, or permit this Court to ignore, the presumption. Petitioner is not entitled to habeas relief based on the admission of evidence regarding Keegan's broken leg.

## IV.    Prosecutorial misconduct

Petitioner next argues that his trial was rendered fundamentally unfair by the prosecutor's misconduct. Petitioner complains that the prosecutor acted inappropriately "in two distinct and egregious ways[: f]irst, he committed misconduct in both his opening and closing arguments, when he attempted to sway the jury through sympathy and civic duty arguments [; and second,] . . . the Prosecutor denigrated, not only defense counsel, but also the expert witnesses the Petitioner called to testify on his behalf." (Pet'r's Br., ECF No. 1, PageID.59.)

A.    Sympathy and civic duty

Petitioner highlights two specific instances of the "civic duty" type of improper prosecutorial argument.  First, in the prosecutor's opening statement, the prosecutor charged the jury as follows:

> When this is all said and done[,] we're going to come back and we're going to ask that you speak for your verdict, for Everette Thibeault.  He's not here to speak today.  In fact, he's never going to speak again.  We're going to ask that you come back and hold his father accountable for his actions on March 24, 2012.  That's what justice would demand.  That's what justice would demand.  There won't be any question when this trial is done as to what happened to Everette Thibeault on that evening.

(Trial Tr. I, ECF No. 7-6, PageID.350-351.)  Then, in closing, the prosecutor argued:

> You ask yourself when you go back there, how many incidents does a child get to have?  How many did you have?  How many did your children have?  How many do your grandchildren have, if you have grandchildren?

(Trial Tr. VII, ECF No. 7-12, PageID.1497.)  The objection and response to that argument provide valuable context:

> [Petitioner's counsel]: Judge, I would object to this.  It's improper for the Prosecutor to put the jury in the shoes of the defendant trying to get them to decide the case based on emotion instead of the facts of the case.
>
> [Prosecutor]: It's appropriate argument.  These are all injuries he suffered.  It may be uncomfortable because it's –
>
> THE COURT: I'm going to overrule the objection in light of the fact that I'm going to be giving the jurors an instruction to use their common sense.  But I am going to ask that we move forward and wrap this up.
>
> [Prosecutor]: I'm just about done, your Honor.  How many incidents does a child get to have?  Kids fall down and they don't die.  Kids get broken legs, stitches.  If kids die the way they alleged here, none of us would be here. As a parent you have all heard that sickening thud that blood curdling scream and it may have resolved it in a trip to the hospital or a broken bone, or in stitches, but it didn't resolve it in death.
>
> Infants don't just die. Infants don't just die.  In one minute you are all going to go back and you are going to deliver a verdict.  Verdict is a Latin word that means to speak the truth.  Speak the truth.  We didn't hear the truth from the defendant.

16

Keegan can't tell us the truth. Everette is no longer here to tell us the truth.  Kids don't just die.  Go back and speak the truth, please speak the truth. Thank you.

(*Id.,* PageID.1497-1498.)  The Michigan Court of Appeals concluded that the language Petitioner challenged as inappropriate was not objectionable:

> A prosecuting attorney enjoys wide latitude in fashioning arguments, and may argue the evidence and all reasonable inferences from it.  *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995).  However, "Civic duty arguments are generally condemned because they inject issues into the trial that are broader than a defendant's guilt or innocence and because they encourage the jurors to suspend their own powers of judgment."  *People v Potra*, 191 Mich App 503, 512; 479 NW2d 707 (1991).

> The challenged comments from the opening statement, including the reminder that the young victim would "never speak again," did touch upon matters of some emotional sensitivity.  However, the prosecuting attorney did not suggest in general terms that a serious crime against an infant warrants a conviction.  Instead, the prosecuting attorney insisted that defendant should be held "accountable for his actions," thus keeping in view that the task at hand was determining defendant's responsibility for what happened, not simply avenging the victim.  Further, the prosecutor preceded those comments by summarizing the evidence that would be presented, including that both sides would present experts, and telling the jurors that they would be deliberating on the basis of that evidence.  The statement that justice demands a conviction thus was less an appeal to emotion than an admonishment not to shy away from the unpleasant duty of declaring a man guilty if the prosecution made its case.  Moreover, improper civic-duty arguments may be cured where the trial court instructs the jury that arguments of counsel are not evidence.  *People v Stimage*, 202 Mich App 28, 30; 507 NW2d 778 (1993).  In this case, the trial court did so instruct the jury.  Accordingly, the challenged portion of the prosecuting attorney's opening statement had minimal potential to persuade the jury to find defendant guilty simply out of sympathy for the victim.

> Similarly, the prosecutor's statements during rebuttal argument did not amount to prejudice that denied defendant a fair trial.  The reference to "incidents" to which children, or grandchildren, are exposed came in the context of reminding the jurors that children frequently suffer minor falls, with concomitant minor consequences.  As the trial court noted at the time, this commentary anticipated its standard instruction to the jurors to "rely on your own common sense and everyday experience."  This was not an appeal to emotion or otherwise an improper civic-duty argument, but rather an argument from the evidence that the short fall defendant described did not explain the serious injuries the victim suffered under defendant's care.

(Mich. Ct. App. Op, ECF No. 7-14, PageID.1542.)

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (internal quotation omitted).

The Supreme Court has never considered the propriety of argument specifically described as "civic duty" argument in the habeas context; thus, the clearly established federal law requires a more general analysis of fairness.[4] It is certainly fair for the prosecutor to comment on the evidence; indeed, the prosecutor must be afforded considerable leeway. *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) ("Prosecutors 'must be given leeway to argue reasonable inferences from the evidence.'") (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)). On the other hand, it is certainly unfair for the prosecutor to seek to inflame the passions of the jury. *Viereck*, 318 U.S. at 247-48 (Court held it was improper for prosecutor to appeal to the passion and prejudice of the jury); *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008) ("[A] prosecutor illicitly incites the passions and prejudices of the jury when he calls on the jury's emotions and fears—rather than the evidence—to decide a case."); *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir.1999), abrogated on other grounds, *Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000) ("[The prosecutor] exceeds the legitimate advocate's role by improperly inviting the jurors to convict the

---

[4] In *Viereck v. United States*, 318 U.S. 236, 247-48 (1943), the Court considered an argument on direct appeal of a federal criminal conviction that certainly falls within the category of "civic duty" argument:

> In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.

> This is war. It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of a crime, just as much as they are relying upon the protection of the Men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.

> As a representative of your Government I am calling upon every one of you to do your duty.

*Id*. at 247 n.3. The Court, however, never described it as a "civic duty" argument. The Court found the argument objectionable, not because it asked the jurors to do their duty, but because it has as its "purpose and effect . . . to arouse passion and prejudice." *Id*.

defendant on a basis other than a neutral independent assessment of the record proof."); *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991) (court held prosecutor may not make arguments "calculated to incite the passions and prejudices of the jurors . . . . ").

        The Michigan Court of Appeals balanced those competing interests in its review of the prosecutor's "justice demands" and "your grandchildren" arguments.  Whether or not this Court agrees with the balance the Michigan Court of Appeals struck, it simply cannot be said that the state court erred beyond the possibility of fairminded disagreement.  To the contrary, the court of appeals' determination is eminently reasonable on this record.  Accordingly, Petitioner has failed to demonstrate that he is entitled to habeas relief with regard to the prosecutor's "civic duty" arguments.

### B.    Disparaging the defense and its experts

        Petitioner also complains that the prosecutor unfairly attacked his counsel and his expert witnesses.  With regard to the expert witnesses, the prosecutor focused his argument on the fact that they were paid, and paid well, for their testimony:

> You also heard from Dr. Plunkett since 2005 he's never testified except for the defense and he testifies in these kind of cases over, and over, and over.  When the Judge gives the instruction later on -- and I'm going to talk about it in a few minutes, about judging the credibility of a witness, even an expert witness, you don't have to believe everything they said.  You can choose to believe some of it, all of it, or none of it.  All in all, how does their testimony gibe with the rest of the evidence in a case?  Here's a guy who makes his part time with his retirement, testifying in these kind of cases.  If he wants to continue to make $100,000.00 a year for a part time gig, testifying about 18 times a year, well he's got to give an opinion where they'll hire him and bring him in to testify.

> Dr. Abern testified that this is again, an intracranial build-up of pressure and the triggering -- oh, the cascading event was this fall from the couch.  He's another guy that likes litigation.  He testifies more for plaintiffs who sue doctors and hospitals and apparently makes a very good living doing that because it's about 10% of his income per year that comes from testifying in these kind of cases.  He's from Illinois and I think he makes about $40,000.00 a year.  So he's on the low side

of the scale compared to Dr. Plunkett.  But it's a part time gig and I bet a lot of us would like to have a part time gig that pays that kind of money.

But the point of it all is, if you don't give opinions that will cause the other side to pay you to come in, then that dries up.

(Trial Tr. VII, ECF No. 7-12, PageID.1453-1455.)  In response, Petitioners' counsel noted that all of the doctors who testified, whether on behalf of the prosecution or the defense, were paid.  (*Id.*, PageID.1467-1468.)  The prosecutor took up the issue again in rebuttal:

The other reason why these don't mean anything is exactly what we talked about before.  Any witness, including experts, who has something to gain?  Who has a bias or a prejudice in the case?

These two guys, particularly these two guys, this guy, the 4 sentence guy has got $9,500.00 worth of reasons that he says this is possible.  This guy has between $5,000 and $6,000.00 worth of reasons that he authors these reports.  He's retired.  He doesn't even practice anymore. That jury instruction, all in all, how reasonable does this stuff sound when you look at all the evidence?

\*      \*      \*

This guy, Plunkett, does this 15 times a year, always for the defense.  He told you that, since 2005, that's what he does.  He makes $100,000.00 a year [in] retirement, doing that.

\*      \*      \*

The same thing with this guy.  He's got more at stake.  He's got $9,500.00.  In fact, when you add in the biomechanical guy, who interestingly enough, agrees that these injuries Everette suffered could be caused by abuse -- he's not here to testify about that.  What he did tell you was, he was simply asked to answer 2 questions, 2 questions the defense posed to him.  He wasn't going to get into anything else because that might take him down the wrong path.  He answered 2 questions and when you total that all up, those 3 experts, that is over $20,000.00 worth of bias in this case.  Those 3 experts were worth over $20,000.00 worth of opinion that was bought for.  I wasn't going to say anything about this but Counsel brought it up.  It was bought.  It was bought.

[Petitioner's counsel]: Your Honor, I'd object to that.

[Prosecutor]: They're his words.

[Petitioner's counsel]: The jury's purpose is to decide the case based on the facts, not on emotions. The Prosecutor is bringing this up just to try to get them to decide this based on anything other than the facts.

THE COURT: Your objection is noted. I'm going to ask you to stick to the facts.

[Prosecutor]: Thank you. The facts are and we heard it from the witness chair, those 3 witnesses cost over $20,000.00.  Who has a bias or prejudice?  If they don't continue to give favorable opinions, they don't continue to get work.

(*Id*., PageID.1485-1486.)

The Michigan Court of Appeals analyzed Petitioner's challenge using the same approach it used with respect to the "civic duty" challenge.  The court considered whether the argument could properly be considered comment on the evidence or whether it was intended to inflame the passions of the jury:

Defendant also argues that the prosecutor improperly denigrated the defense. Defendant contends that the prosecutor improperly emphasized that the defense experts were well paid for their time and testimony. . . .  A prosecuting attorney "must refrain from denigrating a defendant with intemperate and prejudicial remarks." *Bahoda*, 448 Mich at 283.  However, "[e]vidence that shows bias or prejudice on the part of a witness is always relevant . . . . Accordingly, testimony which touches the bias or interest of the witness is always admissible, and can be shown upon his cross examination . . . ." *Powell v St John Hosp,* 241 Mich App 64, 72-73; 614 NW2d 666 (2000) (citations, internal quotation marks, and brackets omitted).

With respect to the prosecutor's argument concerning bias, defendant relies on *People v Tyson*, 423 Mich 357; 377 NW2d 738 (1985), wherein our Supreme Court reversed a criminal conviction in part because the prosecuting attorney belabored that the psychiatrist the defense called in support of an insanity defense had been paid for his appearance.  *Id*. at 373-377.  However, in that case the prosecutor was not arguing from the evidence, but rather introduced the issue of the witness's being paid in the course of argument.  *Id*.  Further, as this Court noted in *People v Miller*, 182 Mich App 482; 453 NW2d 269 (1990), our Supreme Court reversed in *Tyson* partly because the prosecuting attorney's argument "was filled with innuendos, insults and ridicule."  *Id*. at 486, citing *Tyson*, 423 Mich at 375.

In this case, the defense experts' respective compensation arrangements were in evidence.  To the extent there were any innuendos to the effect that those experts had financial incentives to testify favorably to the defense, that was reasonable argument from the evidence.  See *People v Chatfield*, 170 Mich App

22

831, 834; 428 NW2d 788 (1988) (holding that closing remarks pointing out that a defense expert was a "hired gun" did not merit reversal). Although the prosecutor argued forcibly in that regard, the commentary fell far short of the insults and ridicule of which *Tyson*, 423 Mich at 375, disapproved and "[a] prosecutor need not confine argument to the blandest of all possible terms." *People v Marji*, 180 Mich App 525, 538; 447 NW2d 835 (1989) (quotation marks omitted). Moreover, defense counsel made similar arguments concerning the prosecution's experts during his closing argument. In short, the prosecution's arguments concerning bias did not amount to misconduct that denied defendant a fair trial. *Truong*, 218 Mich App at 336.

(Mich. Ct. App. Op., ECF No. 7-14, PageID.1543-1544.)

Petitioner also argues that the prosecutor's characterization of Petitioner's defense as the "squid defense" disparages Petitioner's expert witnesses and his counsel. After Petitioner's counsel presented his closing, the prosecutor began his rebuttal with the following remarks:

That's called the squid defense. If any of you know about squids in the ocean, when they are in trouble, when they are in danger, they drop their ink into the water and that ink then muddies up the water, clouds up, and the squid swims away, away from the danger and that's what this is about.

Let's talk about some of the things that have been addressed here. First, these 2 reports mean nothing. They mean nothing. Dr. Guertin went through these point by point. You heard from Dr. Schmidt who came in from one of the busiest medical examiner offices in the country and told you this is inflicted head trauma. It's a homicide. These guys talk in terms of possibilities. Everything they say theoretically, might be possible, but it's not true based on the evidence. It's just what like I said earlier, there might be life on Mars but we don't know that. We can't say that it just didn't happen. It's possible but that's not what happened here. It's the squid defense.

(Trial Tr. VII, ECF No. 7-12, PageID.1484-1485.) As the prosecutor continued his rebuttal, he would comment on the evidence and two more times he characterized Petitioner's evidence or arguments as the "squid defense." (*Id.,* PageID.1490, 1496.) Although Petitioner's counsel objected when counsel thought the prosecutor inaccurately described the record evidence, counsel never objected to the "squid defense" characterization.

The court of appeals was not swayed by Petitioner's argument that the "squid defense" comments rendered his trial unfair:

> With respect to the prosecutor's comments concerning a "squid defense," "[a] prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury . . . [h]owever, the prosecutor's comments must be considered in light of defense counsel's comments." *People v Watson*, 245 Mich App 572, 592-593; 629 NW2d 411 (2001).  In this case, the prosecutor's remarks were made in rebuttal to defense counsel's closing argument.  During his closing argument, defense counsel argued that there were multiple mistakes made by Dr. Guertin and the treating physicians in general.  Defense counsel argued that there were inconsistencies between Dr. Guertin's testimony and testimony of another prosecution expert.  Defense counsel cautioned the jury not to fall into the prosecutor's "trap."  Viewed in context, the prosecutor's remarks about a "squid defense," essentially amounted to an argument that defense counsel was attempting to divert the jury's attention to minor inconsistencies rather than focusing on the evidence supporting defendant's guilt.  The prosecutor did not suggest that defense counsel was deliberately lying and was instead responding to defense counsel's arguments.  *See Watson*, 245 Mich App at 594 ("It was not improper for the prosecutor to respond by emphasizing the truth of the big picture, despite defense counsel's attempts to find discrepancies between the testimony of various witnesses.")

(Mich. Ct. App. Op., ECF No. 7-14, PageID.1544.)

As noted above, a prosecutor has considerable leeway in presenting arguments to the jury.  The prosecutor may "prosecute with earnestness and vigor . . . [;] he may strike hard blows . . . ." *Berger*, 295 U.S. at 88.  But, "he is not at liberty to strike foul ones." *Id*.  The line between fair and foul in this context, however, is not well-defined.  Not every aspersion cast by a prosecutor upon a defense attorney's presentation of a case requires reversal of the guilty verdict. *See Young*, 470 U.S. at 11 (stating that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial").

With regard to the expert compensation issue, Petitioner does not and cannot argue that it was impermissible to admit evidence regarding the experts' compensation arrangements. That issue has been settled in Michigan for decades. *See, e.g., Alford v. Vincent*, 19 N.W. 182 (Mich. 1884).[5]  Michigan also permits inquiry into the amount of money a witness makes from providing expert testimony, in that and other cases, and whether the witness has demonstrated a pattern of testifying for particular attorneys or a particular side. *See, e.g., Wilson v. Stilwell*, 309 N.W.2d 898 (Mich. 1981).  For the prosecutor to comment on such properly admitted evidence is simply not misconduct.  The court of appeals' determination to that effect is neither contrary to, nor inconsistent with, clearly established federal law.[6]

The "squid defense" comments may be a little bit closer to the foul line.  But, courts have concluded that even more directly disparaging remarks are permissible.  "A prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992); *see also Brown v. McKee*, 231 Fed. Appx.

---

[5] The matter is similarly resolved in other jurisdictions as well.  Some courts invite jurors to consider the bias that might follow payment for testimony in their standard jury instructions or declare evidence regarding such compensation always relevant to witness credibility. *See, e.g., Simpson v. Quarterman*, 593 F. Supp. 2d 922, 937 (E.D. Tex. 2009) (jury instruction); *Liu v. Mitchell*, No. 04-1042H(LSP), 2006WL5740966 (S.D. Cal., Jan. 12, 2006) (evidence code).  Others have recognized argument regarding expert compensation as legitimate comment on evidence properly admitted. *See, e.g., United States v. Mullins*, 446 F.3d 750, 762 (8th Cir. 2006); *Davis v. Polk*, No. 1:05CV29-W, 2007WL2898711, at *39 (W.D.N.C. Sept. 28, 2007).

[6] Petitioner cites only state cases in support of his contention that the prosecutor's argument was improper.  (Pet'r's Br., ECF No. 1, PageID.65-66.)  Moreover, the cases Petitioner cites present a different issue.  In those cases, the courts did not find the prosecutor's argument objectionable because it was an inflammatory comment on properly admitted evidence.  Those courts found the arguments objectionable because they offered inflammatory comment when there was no supporting record evidence at all. *People v. Tyson*, 377 N.W.2d 738 (Mich. 1985) (no evidence regarding compensation in the record and the prosecutor's statement regarding the expert was knowingly inaccurate); *People v. Cowles*, 224 N.W. 387, 388 (Mich. 1929) (prosecutor referred to defense experts as "medicine men and . . . voodoos" who simply parroted what defense counsel told them); *People v. Williams*, 188 N.W. 413, 416 (Mich. 1922) (prosecutor referred to defense experts as prostitutes).

469, 480 (6th Cir. 2007) (a prosecutor's isolated comments in closing argument that the defense was attempting to trick the jury is not an improper disparagement of defense counsel).

In *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009), the Sixth Circuit considered the propriety of comments similar to the "squid defense" comments at issue here:

> Bedford complains about comments by the prosecutor in closing argument at the guilt phase that allegedly disparaged defense counsel's tactics.  The prosecutor called "[s]ome" of Bedford's "arguments" "Mickey Mouse defenses," JA 2301, and he characterized others as attempts to "confuse" the jury by "fill[ing] the courtroom with as much smoke as you possibly can," JA 2304, casting aspersions "all around the courtroom" and putting "everyone on trial in the case except our little boy over here"-all in the hope that the jury would "lose sight of the real issues in the case," JA 2315.  Attempting to deflate an attempt by the defense to discredit a particular government witness, the prosecutor also predicted that the witness would "be dragged through the mud by the defense." JA 2258.
>
> These comments were not improper. The prosecution necessarily has "wide latitude" during closing argument to respond to the defense's strategies, evidence and arguments.  *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008); *see Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000).  How far the government may go, true enough, depends on what the defense has said or done (or likely will say or do).  *See United States v. Young*, 470 U.S. 1, 12-13, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).  And in all events the prosecutor may not simply belittle the defense's witnesses or deride legitimate defenses, *see Slagle v. Bagley*, 457 F.3d 501, 522 (6th Cir. 2006); *Gall v. Parker*, 231 F.3d 265, 314-16 (6th Cir. 2000), abrogated on other grounds as recognized in *Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003), nor may he offer his own opinion about a witness's credibility, *see Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008).  But the prosecutor's remarks in this case-all made in the course of the fast-moving thrust and parry of a criminal trial-did no more than respond to Bedford's actual and reasonably likely contentions and tactics.  *See United States v. Bernard*, 299 F.3d 467, 487-88 (5th Cir. 2002); *United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992).

*Bedford*, 567 F.3d 225, 233 (6th Cir. 2009).

Comparing the defense case to a smokescreen is similar, but not identical, to comparing the defense case to squid ink.  Nonetheless, several courts have concluded that the "squid ink" argument does not rise to the level of prosecutorial misconduct warranting appellate or habeas relief.  *See United States v. Duque*, 123 F. App'x 447, 449 (2d Cir. 2005) ("The

government's comparison of the defendants' case to squid ink . . . [was], at the very most, mildly inappropriate . . . ."); *United States v. Lopez-Alvarez*, 970 F.2d 583, 598 (9th Cir. 1992) (court held comparison of defense counsel to a squid was acceptable); *Snow v. Reid*, 619 F. Supp. 579, 585-585 (S.D.N.Y. 1985) (court held that "squid and octopus ink" analogy was permissible); *Flores v. Keane*, 211 F. Supp. 2d 426 (S.D.N.Y. 2001) (court held that "octopus ink" analogy was permissible); *Jackson v. Hall*, No. 03-9038-RSWL (MAN), 2008 WL 647548, at *32 (C.D. Cal. Jan. 24, 2008) (court held that "squid ink" analogy fell within the permissible scope of attacking arguments made by defense counsel). Courts have also accepted the more general argument that defense counsel is muddying the waters. *See, e.g., Funderburk v. Cartledge*, No. 5:11-1596-RBH-KDW, 2012 WL 4009379 (D.S.C. Aug. 15, 2012).

To prevail, Petitioner must demonstrate that the Michigan Court of Appeals' determination that the "squid defense" argument is not misconduct is wrong beyond the possibility for fairminded disagreement. Petitioner cannot make that showing. The court of appeals' analysis is not unreasonable on the record and it is in agreement with many other courts that have considered and permitted the same argument.

Moreover, even had the prosecutor's comments been improper, they were not flagrant enough to justify habeas relief. *See Henley v. Cason*, 154 F. App'x 445, 447 (6th Cir. 2005). The prosecutor's comments were not so incendiary so as to inflame the jury's passion or distract them from determining petitioner's guilt or innocence. *See Davis v. Burt*, 100 F. App'x 340, 348 (6th Cir. 2004). When combined with the instruction from the trial judge that the attorneys' arguments, questions, and statements were not evidence, (Trial Tr. VII, ECF No. 7-12, PageID.1500.), the prosecutor's comments did not render the entire trial fundamentally unfair. *Byrd*, 209 F.3d at 537. The Michigan Court of Appeals' determinations that the prosecutor's

arguments did not constitute misconduct are neither contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on his prosecutorial misconduct claims.

### V.    Sufficiency of the evidence

Finally, Petitioner challenges the sufficiency of the evidence with regard to the charge of first-degree child abuse.[7]   Specifically, Petitioner contends that there was insufficient evidence regarding his intent to harm Everette or that Petitioner caused the harm to Everette. (Pet'r's Br., ECF No. 1, PageID.86.)

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*   Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).  "[C]ircumstantial evidence alone can sustain a guilty verdict and . . . circumstantial evidence need *not* remove every reasonable hypothesis except that of guilt."  *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984).

---

[7] If Petitioner were to prevail on his habeas claim with regard to the sufficiency of the evidence on the first-degree child abuse charge, relief would also be warranted with respect to the felony-murder charge because child abuse was the felony upon which the murder charge was predicated.

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.  Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*[8]; second, deference should be given to the Michigan [Court of Appeals'] . . . consideration of the trier-of-fact's verdict, as dictated by AEDPA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds.  *Id*. at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals, though it relied upon state authority, applied the *Jackson* standard: "When reviewing the sufficiency of evidence in a criminal case, a reviewing court must view the evidence of record in the light most favorable to the prosecution to determine whether a rational trier of fact could find each element of the crime was proved beyond a reasonable doubt."  (Mich. Ct. App. Op., ECF No. 7-14, PageID.1534.)  After reviewing the elements the prosecutor was required to show, the court applied the standard:

> In this case, viewed in a light most favorable to the prosecution, there was sufficient evidence to allow a rational jury to conclude beyond a reasonable doubt that defendant knowingly or intentionally caused serious physical harm to the victim. Here, evidence showed that, at the time the victim suffered his fatal injuries, he was in defendant's exclusive custody.  Testimony showed that, immediately before defendant took the victim into his custody, the victim was active and alert with the babysitter. The prosecution presented expert witnesses who disputed defendant's assertion that the victim suffered his injuries following a fall from a couch.  Instead, several experts testified that the victim's injuries were caused by

---

[8]"[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Jackson,* 443 U.S. at 326.

abuse, which supported the prosecution's theory that defendant intentionally inflicted fatal injuries upon the victim. Specifically, Dr. Adam testified that the victim suffered retinal hemorrhaging, which normally resulted from child abuse. Dr. Guertin testified that the victim's injuries were not consistent with a fall from a couch, and that the injuries were normally associated with either a high-velocity car accident, which had not occurred, or child abuse. Dr. Bechinski testified that the victim's extensive internal injuries could have resulted from hard shaking and Dr. Castellani testified that the victim's severe injuries were "by far, by far most commonly encountered in inflicted or abusive injuries." Finally, Dr. Schmidt testified that the cause of death was abusive head trauma and the manner of death was homicide.

On this record, a rational jury could have concluded beyond a reasonable doubt that defendant intentionally or knowingly inflicted serious injury upon the victim. Although defendant offered expert testimony to rebut the prosecution's experts, and although defendant testified that he did not harm the victim, issues involving the credibility of witnesses and weight accorded the evidence are matters for the jury to resolve. *People v Stiller*, 242 Mich App 38, 42; 617 NW2d 697 (2000). Furthermore, to the extent defendant argues that there was no direct evidence to show that he intentionally or knowingly inflicted a serious injury upon the victim, the prosecution is not required to offer direct evidence; instead, "[c]ircumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime." *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177 (1993). Here, the prosecution introduced a significant amount of circumstantial evidence that would allow a rational jury to conclude beyond a reasonable doubt that defendant committed the charged offenses.

*    *    *

"An actor's intent may be inferred from all of the facts and circumstances . . . and because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v Fetterley*, 229 Mich App 511, 517-518; 583 NW2d 199 (1998) (citations omitted). Here, evidence that the victim sustained his injuries while in defendant's exclusive custody combined with the testimony of the prosecution's expert witnesses discussed above was sufficient to allow a rational jury to conclude beyond a reasonable doubt that defendant caused severe physical harm and acted with intent or knowledge that serious injury would result from his actions.

(Mich. Ct. App. Op., ECF No. 7-14, PageID.1535-1536.)

Petitioner's challenge to the sufficiency of the evidence is founded on his claim that

the evidence was entirely circumstantial. Petitioner argues that there was no *direct* evidence that

Petitioner "ever did anything at all to cause the victim's death[,]" (causation),  or that Petitioner

"subjectively desired to seriously harm the child or knew that prohibited result would ensue[,]" (intent).  (Pet'r's Br., ECF No. 1, PageID.86.)

      The proofs here were wholly circumstantial.  But, "'circumstantial evidence is entitled to the same weight as direct evidence.'"  *Bechtol v. Prelesnik*, 568 F. App'x 441, 450 (6th Cir. 2014) (quoting *United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993)); *see also Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *Morrow v. Tennessee*, 588 F. App'x 415, 421 (6th Cir. 2014) ("[E]ven though the State may not have shown direct evidence of intent, circumstantial evidence is enough."); *Britt v. Howes*, 404 F. App'x 954, 956-57 (6th Cir. 2010) ("'[C]ircumstantial evidence alone is sufficient to sustain a conviction . . . .'").  Persons convicted of physical or sexual abuse of babies or infants routinely point to the circumstantial nature of the evidence when challenging its sufficiency; the argument routinely fails.[9]  The court of appeals' conclusion that evidence can be sufficient to support Petitioner's convictions even though it is wholly circumstantial and based principally on the nature of the victim's injuries, therefore, is neither

---

[9] *See United States v. Deuman*, 568 F. App'x 414, 419 (6th Cir. 2014) (where the defendant contended proof of causation was insufficient because it was circumstantial, court upheld conviction of first-degree murder caused by aggravated sexual abuse of three-month-old girl, stating: "Circumstantial evidence alone can sustain a guilty verdict."); *Woodard v. Curtin*, No. 13-cv-15120, 2014 WL 5847588, at *12 (E.D. Mich. Nov. 12, 2014) (where the petitioner, found guilty of first-degree child abuse and manslaughter of two-year-old boy, contended proof of intent was wholly circumstantial and permitted inference of intentional or accidental harm, court denied habeas relief stating: "'[C]ircumstantial evidence is intrinsically as probative as direct evidence even where the conviction rests solely upon circumstantial evidence.'"); *League v. Lafler*, No. 05-74926, 2008 WL 2705499, at *21 (E.D. Mich. Jul. 10, 2008) (where the petitioner, found guilty of first-degree child abuse and felony-murder of two-year-old girl, challenged the sufficiency of the circumstantial proof of intent consisting only of evidence regarding the nature of the injuries, court denied habeas relief stating: "[Intent] may be inferred from the circumstances of the death."); *Mobley v. Stovall*, No. 05-CV-74707, 2007 WL 772922, at *4 (E.D. Mich. Mar. 12, 2007) (where the petitioner, found guilty of felony-murder based on incident of child abuse against 4-year-old boy, the court denied habeas relief over challenge to sufficiency even though the only proof of intent was circumstantial based on the nature of the injuries); *Church v. Pitcher*, No. 1:02-cv-231, 2006 WL 581007, at *4 (W.D. Mich. Mar. 7, 2006) (where the petitioner, convicted of second-degree murder based on an incident of child abuse against a six-month-old boy, argued that proof of causation and intent was insufficient because it was circumstantial, court affirmed the denial of habeas relief).

contrary to, nor an unreasonable application of, clearly established federal law.  The evidence, though circumstantial, viewed in a light most favorable to the prosecution, was sufficient to support the jury's verdict with respect to causation and intent.  Petitioner is not entitled to habeas relief on his sufficiency-of-the-evidence challenge.

### Certificate of Appealability

Unless a certificate of appealability is issued, an appeal of the denial of a habeas corpus petition may not be taken.  28 U.S.C. § 2253(c)(1).  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists would not conclude that this Court's denial of Petitioner's claims is debatable or wrong.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).


Dated: December 28, 2017                              /s/ Ellen S. Carmody
                                                 ELLEN S. CARMODY
                                                 U.S. Magistrate Judge




**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).